McCARTHY v. PENNSYLVANIA R. CO. (Supreme Court, Appellate Division, Fourth Department. November 11, 1906.) Action by Daniel F. McCarthy against the Pennsylvania Railroad Company. Verdict was directed for defendant, and plaintiff moves for new trial on exceptions ordered to be heard in the first instance in the Appellate Division. Exceptions

overruled, and new trial denied. Motion by the plaintiff for a new trial upon exception taken at the trial, and ordered to be heard in the first instance in this court. At the close of the evidence a motion was made by the defendant for a direction of a verdict of no cause of action. The motion was granted, and exceptions taken thereto by the plaintiff, and upon these exceptions this motion is made. The action is to recover damages for the death of the plaintiff's intestate, who was in the defendant's employ as a fireman, and was killed in a collision between his train going south and another train coming north, which occurred on the morning of July 25, 1904, and which the plaintiff claims was caused by the negligence of the defendant. George E. Spring and James T. Ward, for plaintiff. Frank Rumsey and Allen J. Hastings, for defendant.

PER CURIAM. Plaintiff's exceptions overruled, motion for new trial denied, and judgment ordered for defendant on the verdict, with costs to the defendant.

KRUSE, J. (dissenting). The north-bound extra train which collided with the section of the south-bound regular train had run from Olean, its starting point, to Machias, a station about one-third of the distance from Olean to Buffalo, its final destination, in obedience to proper orders from the train dispatcher. It left Machias, proceeding northward, when it ought not to have done so. The question arises, who was at fault? The defendant contends that the blame is with the engineer, or persons in charge of the north-bound train, in failing to observe the orders of the train dispatcher and the rules and regulations of the railroad company for operating its trains. The plaintiff contends, on the other hand, that the fault lies with the railroad company itself, in failing to make and require its employés to observe proper rules for the running of its trains; the specific claim being that, notwithstanding its printed rules and regulations, engineers or persons in charge of trains were permitted to take the verbal communications of a station telegraph operator as to the arrival or nonarrival at that station of another train or section of a train having a superior right to the track, and as to whether the superior train or section which had so arrived and come to its journey's end had carried signals for another train which followed, and had a like superior right to the track. The defendant contends that its employés had no such permission, and that no such practice existed, while the plaintiff contends to the contrary. It is further claimed by the plaintiff that, irrespective of that question, the train dispatcher was negligent in not stopping the extra north-bound train after he had been informed that it had left Machias; the contention being that he could have stopped it in time to prevent the accident, as the collision occurred between Lime Lake, the first station north of Machias, and Delevan, the second station north of Machias. In reply to this claim the defendant contends that the dispatcher had no reason to believe that the extra north-bound train would not keep out of the way of the section of the regular south-bound train; that he had no information that the engineer of the north-bound train was not aware of the approach of the regular south-bound section. It is suggested on behalf of the plaintiff that there was but one switch between Machias and Delevan, the two stations from which the two trains were approaching each other, and that it was blocked at Lime Lake, and that therefore the dispatcher must have known that there was but a single track available. It seems, however, that a siding extended the entire distance from Machias to Lime Lake, and, in addition to the entrance just north of Machias, there were several crossovers, by which the north-bound extra could have taken the siding. If, however, the report to the train dispatcher indicated that the extra north-bound train had left Machias for Arcade regardless of the rights of the section with which it afterward collided, and was then trespassing upon the track rights of that section, there would still be force in the suggestion that the dispatcher knew or ought to have known of the imperiled situation of the two trains. However, I am inclined to the opinion that the evidence does not establish that the extra north-bound train could have been intercepted at the Lime Lake station, as is claimed on behalf of the plaintiff. It does not appear that there was any one present at the Lime Lake station at that time of day. The inference is to the contrary, as the station agent, who was also the operator, was customarily away from the station, attending to the water tanks, during that time, so that he could not have been communicated with by telegraph; and, even if the station was connected by telephone with the commercial system operating in that territory, as is claimed by the plaintiff, the telephone would have been equally unavailable in the absence of the agent. It is also urged on behalf of the plaintiff that the semaphore at Lime Lake indicated that the track was clear between Lime Lake and Delevan, the next station to the north, when the north-bound extra reached Lime Lake, and that this was at least a contributing cause, without which the accident would not have happened, and for the consequences of which the defendant is liable. We are left considerable in the dark as to just how extensive a use was made of this semaphore. Upon the part of the defendant it is contended that it was used only as an order board, and that its position upon this occasion indicated simply that there were no orders for the train; that this is a single track road, and was not operated under the system known as the block system, and that even if that system had been in use there, the rules relating to the block signals do not relieve the trainmen from observing all rules in regard to the protection of their trains. The 216th rule seems so to provide.

The engineer of the north-bound extra testified that the semaphore at the Lime Lake station was clear; that it is an order board: that if the board is raised it indicates that it is blocked, and if it is down it indicates that it is clear, and there are no orders to be received there; that the track is clear and the train has the right to proceed; and if the semaphore was blocked, that would indicate that the train must stop; that the semaphore at Lime Lake upon this occasion was down.

The rules relating to block signals, however, seem to provide for color signals. Rule 202 states that red indicates that the block is not clear, and means stop, white, that the block is clear, and means permission to proceed, and green, that there are one or more trains on the block, and is permission to proceed with this knowledge. It is, however, further urged on behalf of the plaintiff that whether or not the block system was in use, the evidence shows that the engineer of the north-bound train had a right to rely upon the semaphore, and that this evidence shows that it indicated that the block was clear, and that he had the right to proceed. Assuming that to be so, I do not think it necessarily follows that the defendant would be liable for the consequences. There is no evidence that it was not a proper appliance, or that it was out of repair, or how it was operated, or who controlled it, or through whose fault it did not indicate the true situation, if such was the case. Counsel for the plaintiff argues that the train dispatcher was negligent in not causing the block at Lime Lake to be closed. The case, however, is destitute of any proof to show that it was through fault of the train dispatcher that the semaphore was not properly adjusted. The case of Hoes v. N. Y., N. H. & H. R. R. Company, 73 App. Div. 363, 77 N. Y. Supp. 117, I think is not in point. The conclusion was reached in that case that the accident occurred solely through the neglect of the general train dispatcher in sending a release order, through which the block signal was made to indicate a clear track. In the case at bar there was no such proof.

The grounds upon which the defendant's negligence is predicated, concisely restated, are: (1) Failure of the defendant to make and enforce proper rules, and permitting its employès to rely upon oral communications and verbal directions in operating trains in the respect and manner heretofore stated. (2) Failure to stop the extra north-bound train in time to prevent the collision, after having been informed that it had left Machias. (3) Failure of the semaphore to indicate the true situation. Neither of the last two grounds required further discussion. As regards the first, it becomes necessary to discuss more in detail the rules of the company, the orders which this extra north-bound train had for its movement, and the evidence of the engineer as regards the effect of, and practice regarding, the oral communications made to him at Machias. It appears that trains are run as regulars and extras. The regular trains are such as are shown on the time tables. They have a superior right to the track over the extras, except as they are subordinated by special orders in writing from the superintendent; and for the purpose of running trains the train dispatcher is regarded as the superintendent. When a regular train is run in parts following each other, the parts are called sections, and are regarded as an entire train. Each has superior track rights to extras. Whenever a train is so run it is indicated by certain signals carried on the engine of each section except the last. The south-bound colliding train was the fourth section of 156, a regular train. Upon this occasion the extra north-bound train received a running order to go from Olean to Buffalo. That meant that it could use the track only when and where it was not in use by the regular trains, and required it to keep out of the way of regular trains. Any deviation of this rule required an order from the superintendent, the train dispatcher usually acting for him, as has been stated; and the rules specifically provided that all orders respecting the movement of trains should be in writing. When an order was given which affected both the superior and inferior trains, the order which held back the superior train was required to be signed or receipted for by the engineer and conductor. The duplicate order was delivered to the inferior train, permitting it to move against the superior train so held back. The inferior train could not move contrary to the time-table of the superior train unless it had such an order, and the regular trains retained their scheduled time-table rights unless they were 12 hours or more behind time. There were other rules and regulations giving precedence of one class of trains over another, but they have no application to the questions involved in this case, and need not be referred to.

In accordance with its orders, the extra north-bound train went to Hinsdale, the first station north of Olean, and there received an order to meet the second section of 156 at Ischua, the next station north of Hinsdale, and also giving it the right of track against third 156 as far north as Cadiz, which was the next station north of Ischua, and the second station south of Machias. That order gave the extra the right of track against second 156 to Ischua, and against third 156 to Cadiz. Upon arriving at Cadiz, it received a third order, which gave it the right of track still further against third 156 as far as Machias. It then proceeded to Machias, and there received another order giving it the right of track from Machias to Arcade against train 150, which was another regular south-bound train. This, however, did not give it the right of track against the section with which it collided, nor against any other regular train or section except 150. The fourth section of regular train 156, which is the one with which the north-bound extra collided, had originally been ordered to run from Buffalo to Emporium. But after it had started out, orders were made annulling the third and fourth sections from Machias, and directing the fourth section to run as the third section south of Machias. These orders were received by the engineers of the third and fourth sections at Arcade, the third station north of Machias. They were not communicated to the extra coming north. When the north-bound extra reached Machias, the third section had arrived there, and its engine had turned on its way back to Buffalo, as directed by the dispatcher. It had carried signals as far as Machias, its destination, and this fact appeared by the telegraph operator's book at Machias, used for the purpose of keeping records of trains. The engineer of the extra north-bound train did not know how many sections there were of train 156, nor was he expected to know that until he had passed the last section, which would carry no signals. The engineer of the north-bound train was called as a witness on behalf of the plain-

tiff. He admitted that he was familiar with the rules of the company and with the time-tables, and showed his right to run his train as he did to Machias by the orders. He admitted that he observed the signals on the second section, and was aware of the fact that another section was to follow. His attention was called to one of the orders which he received, in which a third section of 156 was referred to, and he said that that indicated "there would be a third section of 156 between Cadiz and Hinsdale." He further admitted that when he had reached Machias he knew that he had not passed the third section, and that he did not see it there, and that all of these sections would have a superior right over his train. But he further stated that when he arrived at Machias he learned that the third section had arived there, and turned back to Buffalo; that he was so told by the operator, by the baggage-master, or target man. He admitted that after he had received the order against another regular train from the north he knew he had no further order against train 156, with a section of which his train later collided; that before he reached Machias he did not know how many sections there were of 156; whether there were more than three would be indicated by the signals that third 156 carried. He further testified as follows: "I asked Connors [the operator] if third 156 had been there. He told me everything was all right, and go ahead. I asked him if third 156 had signals. He told me everything was all right, and go ahead. That was all Connors said. Q. You construed that to mean, or that conveyed to you the idea third 156 had been there without signals? A. Yes, sir. If his information given me had been correct, that showed to me there was no fourth section 156; that was my view of it. I understood when I reached Machias that I was to ascertain if I did not see third section 156 whether it carried signals or not. So I asked the operator, as I have stated. Having an order against 150, that would clear the track of schedule trains between Machias and Arcade for my train, and it was based upon that that I decided that I had a right to go ahead between Machias and Arcade. I didn't see third 156 when I reached Machias. I left Olean about midnight. When I reached Machias, I obtained information from Mr. Fish, the baggageman, that third 156 had turned at Machias and returned to Buffalo. Mr. Fish told me that just before I got off the engine. I received that information from no other source than Mr. Fish, and I didn't ask Mr. Fish whether third 156 carried signals or not." He did not consult the train record to see if the third section carried signals, and I am not aware that it is claimed by either party that he was required to do so. The operator, Connors, was also called as a witness for the plaintiff. He stated that he delivered the order against train 150, the other regular train from the north. and that he stated to the engineer that he had better pull his train across the intersecting railroad, as there was switching being done which might cut off his crossing. He testified that Mr. Fish, the baggagemaster, asked him if the third 156 was there or had arrived, and he answered and said, "She has arrived"; that

nothing was said about the train carrying signals, and that he never mentioned the word "signals," nor mentioned in any way whether this section had carried signals, and that, as a matter of fact, the records showed that the third section had arrived there about an hour before, and that it did carry signals; that there was nothing to indicate to the trainmen of the north-bound extra that the third section of 156 had arrived at Machias, except what he told Fish; that there was nothing that they could observe that would give them information that the train had arrived, and they saw that no live train was representing this third section. This is, in substance, the evidence as to what information was imparted to the crew of this north-bound colliding train. Upon the subject of his right to rely upon this oral information, the engineer of the north-bound colliding train said that the railroad company had classes of instruction which he attended, and which were taught by a Mr. Hinedell, the trainmaster. A part of this testimony is as follows: "The engineer: We were instructed in that school to take the operator's word for the movement of trains. By the Court: What operator, the local? A. Yes, sir; the man that was in the telegraph office. Q. At the different stations? A. Yes, sir. I can't tell just how long before this accident these instructions were given. The instructions were, always take the operator's word at that point where I was running, and I had taken the operator's word as to the movement of trains on the defendant's road since I have been in the service as locomotive engineer, and that would be four years." Upon cross-examination he stated that the class was held in a railway car or coach and in Mr. Hinedell's office, and that the car was in charge of Mr. Hinedell. He was unable to state who was present, or just how long ago it was. He testified that he was there a couple of hours, and was examined as to whether he understood the rules; that that was the purpose of the meeting, and that a book of the company's rules was there; that his examination by Mr. Hinedell was on the train rules and on the movement of trains and on the duties of engineers. Then he said: "I mean by that he instructed me I could take the word of an operator at Machias, for instance, as to the condition of another train; that is, if the operator at Machias told me that third 156 had arrived without signals, that I had a right to take that information; and that is all I mean by his instructing me that I could take the word of an operator. I understood that I had to have train orders in writing to run my train, and that I was to be guided by the time-table and train orders, and that according to the rules when I reached Machias I was to see the third section, and ascertain whether it carried signals or not, or if I did not see that train to ascertain from the operator as to that train whether it had in fact arrived, and with or without signals. I had never seen the book kept by the operator at Machias with the record of the arrival and departure of trains until to-day. The book shows that third 156 arrived at 6:10 at Machias, with green signals, and turned to Buffalo. If I had known they had been there, I would have understood that I couldn't

go on my orders against 150 until I had ascertained as to third 156. By the Court: You would have no right to go as against what? As against fourth 156? A. Yes, sir." In this connection it may be stated that by No. 217 of the company's rules it is made the duty of the trainmaster to " * * * exercise supervision over the men employed on the trains, see that they understand and observe the rules, and suspend them when necessary for neglect of duty. * * * "

Taking the testimony of the engineer as true, I think he had a right to infer from the verbal communications of the operator at Machias that the third section of regular train 156 had arrived there without signals, and also that he had a right to rely thereon and act accordingly. While the printed rules may be adequate and sufficient if lived up to, yet, in view of the interpretation put upon them by the trainmaster in his instructions, and thereafter followed and practiced by the engineer, as claimed by him, I think it cannot be said, as a matter of law, that the defendant acted with due regard for the safety of its employés in making and enforcing rules for the movement of its trains. If such instructions were so given and followed as is claimed by the engineer, I think it is a question of fact for the jury to determine whether, in adopting that manner of communicating information of such importance to the engineer of the opposing train, the defendant exercised reasonable care, prudence, and foresight in guarding the safety of its trainmen employed as the plaintiff's decedent was upon this occasion. Sheehan v. N. Y. C. & H. R. R. Co., 91 N. Y. 332, 338.

The case of Northern Pac. R. Co. v. Dixon, 194 U. S. 338, 24 Sup. Ct. 683, 48 L. Ed. 1006, cited by counsel for the defendant, I think is not at variance with this view. In that case it appeared that a train dispatcher ordered a train forward, relying upon information given him by a telegraph operator that another train had not passed the station. The information was incorrect, and a collision occurred. It was there held upon the two questions certified that the local telegraph operator in giving the information to the train dispatcher acted as a fellow servant of the members of the train crew who were injured by obeying the erroneous order of the dispatcher based upon the false information given by the local operator, and that the negligence of the telegraph operator was a risk assumed by the fireman, who was one of the crew, and was killed in the collision. Whether that case is in conflict with the decisions of the court of our state, and, if so, to what extent, need not now be decided or pointed out. It is sufficient to say that the only question there decided was whether the railroad company was liable for the negligent act of the local telegraph operator in giving false information to the train dispatcher, which was acted upon by the dispatcher in moving forward the two colliding trains. The question of the sufficiency of the rules, the regulations, and method of the railroad company in running trains was not involved in the decision. The question in the case at bar is not the negligence of the operator in giving false information, but rather the method adopted or permitted by the defendant in communicating the information. In speaking of the duties of a railroad company towards its workmen, Judge O'Brien, in Doing v. New York, O. & W. R. Co., 151 N. Y. 579, 583, 45 N. E. 1028, 1029, says: "The defendant had the power to control and regulate its business. The law imposed upon it the duty of making and enforcing such reasonable rules and regulations for the government of the men in its service as to prevent or guard against injury by one servant to another in so far as that was reasonable and practicable." I think it was a question of fact in this case whether the defendant did its full measure of duty in that regard to the fireman of the south-bound section, who was killed in the collision, and for whose death this action was brought.

The plaintiff's exceptions should be sustained, and a new trial granted, with costs to the plaintiff to abide the event of the action.